**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO.:** |
| **LYMAN WARD MILITARY ACADEMY** | ) ) ) ) | |
| **Defendant.** | ) | |

<u>**COMPLAINT FOR DECLARATORY JUDGMENT**</u>

Plaintiff, Travelers Property Casualty Company of America ("Travelers"), files this Complaint for Declaratory Judgment against Defendant, Lyman Ward Military Academy ("Lyman Ward"). In support of this Complaint for Declaratory Judgment, Travelers states as follows:

1. This is an action for declaratory relief for the purpose of resolving an actual controversy concerning the availability and scope of insurance coverage under the insurance policy described below.

2. This declaratory action arises out of a claim for insurance benefits under a property insurance policy that Travelers issued to Lyman Ward.

<u>**PARTIES**</u>

3. Travelers is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

4. Lyman Ward is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Camp Hill, Alabama.

5.      Travelers invokes this Court's jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332 because Plaintiff is completely diverse from Defendant.

6.      The amount in controversy, exclusive of interests and costs, exceeds $75,000.

7.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of property that is the subject of the action is situation and further this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

8.      Travelers issued a property insurance policy to Lyman Ward Military Academy bearing policy number Y-630-3P667055-TIL-22 for the policy period September 01, 2022 to September 01, 2023 (the "Policy") [Exhibit A].

9.      Of the twenty-four buildings on Lyman Ward's property, Lyman Ward only secured coverage under the Policy for seven buildings.

10.     Those seven buildings are identified as Tallapoosa Hall, Dining Hall, Barn, Russell Hall, Dixon Chapel, President's House, and Commandant's House (collectively, the "Insured Buildings").

11.     On or about March 26, 2023, the Insured Buildings were damaged by a hailstorm (the "Storm").

12.     On or about March 26, 2023, Lyman Ward notified Travelers of the loss and sought coverage for the damage to the Insured Buildings.

13.     Travelers investigated the damage to the Insured Buildings and in September 2024, determined that the updated Replacement Cost Value (RCV) of the damages was $2,512,143.58.[1]

---

[1] This figure includes $114,204.69 in Emergency Mitigation Services (EMS) for which Travelers issued payment.

2

The damages were subject to $616,053.57 in deprecation that, when subtracted from the RCV amount, resulted in $1,896,090.01 as the Actual Cash Value (ACV)[2] of the damages. On September 23, 2024, Travelers issued payment to Lyman Ward based on the updated RCV, ACV, and depreciation that was available to be recovered at that time.

14.     Today Travelers' indemnity payments on this loss total $1,846,090.01, which is comprised of the ACV, withheld building depreciation due on the roof replacements, plus emergency mitigation amounts minus the $50,000 deductible. These payments included payment for emergency mitigation, for roof damage and external damage to all seven of the Insured Buildings and for minor interior water damage to some of the Insured Buildings.

15.     However, Lyman Ward's contractor American Construction Management Services, Inc. ("ACMS") generated an estimate for what Lyman Ward contended were damages to the Insured Buildings as a result of the Storm with $4,105,713.27 as RCV, with $448,102.84 in depreciation, resulting in an ACV of the damage of $3,657,531.23.

16.     As a result of these differences, Travelers met with ACMS to re-inspect the property on December 20, 2023. Much of the difference in the estimates was due to a difference in the scope of claimed water damages in the interior of Tallapoosa Hall and Russell Hall. ACMS had identified a drastically different scope of claimed interior water damage that it claimed was a result of the Storm. Much of this alleged interior damage was in located areas never before identified and in which Travelers had not been permitted to inspect. ("Supplemental Interior Damages"). Travelers had identified isolated areas of water damage in some of the Insured Buildings but nothing close to the scope of the ACMS estimate.

---

[2] This figure also includes $114,204.69 in Emergency Mitigation Services (EMS) for which Travelers issued payment.

17.     At the inspection, because the school was closed for the holidays, Travelers was not able to inspect all of the areas identified by ACMS as comprising the Supplemental Interior Damages to Tallapoosa Hall and Russell Hall. As a result, Travelers and ACMS agreed to re-inspect Tallapoosa Hall and Russell Hall with ACMS after the new year and allow ACMS to identify the specific areas of damage that it claimed required repair and were impacted by the Storm. Travelers also requested moisture mapping documents and drying logs for the areas ACMS claimed were damaged by water.

18.     Also at the inspection, Travelers observed that the roof repairs had been completed and requested ACMS provide it with documentation related to those repairs in the form of invoices and payments, so it could review those invoices for further evaluation of the roof damage aspect of the claim. ACMS agreed to provide the requested documentation.

## APPRAISAL DEMAND

19.     However, on December 26, 2023, before the Tallapoosa Hall and Russell Hall re-inspections could be scheduled and before ACMS provided any documentation as to the roof repairs that had been completed, Lyman Ward's representative contacted Travelers and invoked the appraisal provision of the Policy, seeking to have all aspects of the loss appraised.

20.     On January 25, 2024, Travelers responded to the demand and agreed to appraisal, but only as related to the areas that were within the scope of the damage identified in the Travelers estimate and for which it had been allowed to inspect. [Exhibit B (Travelers Letter of January 25, 2024)].

21.     Specifically, Travelers agreed to appraise the following areas ("Appraisable Damages"):

1. The exterior damages at all Covered Locations in accordance with the identical scope contained in Travelers estimate dated 10/02/2023 and ACMS's estimates dated 04/07/2023, 04/08/2023, 04/09/2023, 4/10/2023, and 04/17/2023;

2. The interior damages at all Covered Locations except Tallapoosa Hall and Russell Hall as detailed in the identical scope contained in Travelers estimate dated 10/02/2023 and ACMS's estimates dated 04/07/2023, 04/08/2023, 04/09/2023, 4/10/2023, and 04/17/2023.

22.    Travelers disagreed that appraisal was appropriate for the Supplement Interior Damages. [*See* Exhibit B]. As to the specific areas of Tallapoosa Hall that it had been allowed to inspect for which Lyman Ward claimed additional damage, Travelers did not agree that appraisal was appropriate as the damages identified were not as a result of the Storm but rather were as a result of other causes that triggers certain exclusions in the Policy. *Id.*

23.    Travelers also disagreed that appraisal was appropriate as to the other areas of claimed damage to Tallapoosa Hall and Russell Hall because it had not been allowed to inspect those areas. *Id.* Travelers disagreed that appraisal was appropriate because Lyman Ward had still not provided the documents Travelers had requested at the December 20, 2023 re-inspection— complete moisture mapping records and drying logs. Travelers reiterated its request for these documents. *Id.*

24.    Travelers also disagreed that the Supplemental Roof Damages were appraisable because the repairs were completed prior to Lyman Ward demanding appraisal. *Id.* Travelers explained that the Policy provides that the claim for roof repairs cannot exceed the actual invoiced work and as those invoices had not been provided, there was no basis for to ascertain whether there was a disagreement over the value of the repairs to trigger the appraisal provision. *Id.* As a result, Travelers reiterated its request made on December 23, 2023, that Lyman Ward provide Travelers with the actual invoices for the roofing repairs so it could evaluate the amounts actually spent and

whether those amounts were necessary. Travelers also warned that Lyman Ward's failure to produce the invoices would violate the conditions of the Policy. *Id.*

25.     On April 5, 2024, Lyman Ward's counsel provided Travelers with a Letter of Representation but did not provide any of the requested documents.

26.     On or about June 10, 2024, nearly six months after Travelers requested roof repair support and documentation, Lyman Ward provided a single invoice from its general contractor ACMS dated November 3, 2023 that provided only lump sum charges  it apparently made to Lyman Ward for repairs to the roofs of the Insured Buildings, but no line item detail or sub-contractor documents. Upon review of the ACMS invoice, Travelers determined that there was no change in the scope of the roof repair work performed but that there was a $541,471.86 difference between the ACMS invoice total and Travelers' estimate for the roof repairs ("Supplemental Roof Damages").

27.     As a result, on July 6, 2024, Travelers re-iterated its request for the actual invoices from ACMS's subcontractors, the parties that actually performed the roof repairs, as well as a breakdown of the additional costs ACMS charged above the subcontractor invoice amounts. [Exhibit C (Travelers July 6, 2024 Letter)]. Travelers reiterated that the Supplemental Roof Damages were not subject to appraisal because the roof repairs had already been completed prior to the appraisal demand and Lyman Ward had not provided the requested sub-contractor invoices and breakdown of ACMS charges. . Also, as the only remaining question whether the roof repairs satisfy the terms and conditions of the Policy, in particular the Valuation Loss Condition, is one of coverage and is not appraisable. *Id.*

28.     On August 9, 2024, Travelers was allowed to conduct a re-inspection of the property, specifically to inspect those areas of Tallapoosa Hall and Russell Hall that were included

in ACMS's Supplemental Interior Damages. In advance of that inspection, Travelers reiterated its request for the complete moisture mapping materials and drying logs as well as the subcontractor roofing invoices, but Lyman Ward did not provide those documents and has continued to refuse to produce the roofing subcontractor invoices.

29.    In that inspection, Travelers identified limited additional water damage to specific areas of Tallapoosa Hall. Travelers did not identify any additional damage to Russell Hall. As a result of this re-inspection, Travelers issued a supplemental payment to Lyman Ward on or about September 23, 2024 for the additional water damage identified in Tallapoosa Hall in the amount of $18,798.02 ($32,937.63 RCV less $14,139.61 in recoverable depreciation) and for depreciation holdback on completed roof repairs in the amount of $170,507.22, for a total payment of $189,305.24. However, two large discrepancies remained—totaling approximately $1,707,774.32 for the Supplemental Roof Damages and for the Supplemental Interior Damages.

## EXAMINATIONS UNDER OATH

30.    On September 25, 2024, pursuant to the terms and conditions of the Policy, Travelers requested the Examination Under Oath ("EUO") of a Lyman Ward representative. Travelers also included Requests for Production to Lyman Ward seeking documents related to the outstanding discrepancies. These requests included renewed requests for moisture mapping documents, drying logs, and roofing subcontractor invoices and other categories of documents related to the damage claims.

31.    On December 12, 2024, Douglas Peebles, Treasurer of the Lyman Ward Board of Directors presented for EUO as Lyman Ward's representative. Mr. Peebles was unable to answer questions on multiple topics at the center of the dispute and did not produce any additional documents. However, he confirmed that Lyman Ward agreed to produce documents responsive to

the requests, including the moisture mapping materials, the full drying logs, and the roofing subcontractor invoices.

32.     Mr. Peebles was asked under oath "with respect to those subcontractor invoices for the roof, if Lyman Ward has any, it doesn't have a problem producing those to Travelers, correct?" Mr. Peebles testified, "Correct, we have no problem producing them." [Exhibit D (EUO Transcript of Douglas Peebles), trp. 59:7–13)].

33.     Mr. Peebles was asked under oath "And any subcontractor invoices that may not be Lyman Ward's possession but may be in the possession of ACMS, does Lyman Ward have any issue with going to ACMS and asking ACMS to provide those to Travelers?" Lyman Ward's representative testified, "No issue, no problem." [Exhibit D, trp. 59:14–20].

34.     At his examination under oath, Mr. Peebles testified, "We'll ask the contractor for any supporting documents." [Exhibit D, trp. 95:18–19].

35.     On January 5, 2025, Lyman Ward completed a Sworn Statement Proof of Loss claiming $4,256,265.43, in damages as a result of the Storm.

36.     On January 15, 2025, Travelers followed up with Lyman Ward requesting production of categories of documents requested in advance of the December 12, 2024 EUO of Mr. Peebles. These requests included, but were not limited to, the same moisture mapping materials, drying logs, supporting documentation for the damage claims, the contract with Lyman Ward's appraiser, and subcontractor roofing invoices.

37.     While Lyman Ward produced some maintenance records and confirmed it did not have any more moisture mapping materials or drying logs, it failed to produce the requested roofing invoices or the contract with its appraiser.

8

38.     As a result, on February 10, 2025, Travelers requested a second examination under oath, this time with a representative who could respond on the dozens of areas of inquiry of which Mr. Peebles had no knowledge. Travelers renewed its request for the contract and the roofing invoices.

39.     On March 19, 2025, Lyman Ward presented Mark Morgan as its representative for the second EUO. At this second EUO, although Mr. Morgan did not provide the requested documents, Mr. Morgan confirmed that Lyman Ward was willing to produce the subcontractor roofing invoices and would do so.

40.     During his examination under oath, counsel for Travelers asked Mr. Morgan if he, as Lyman Ward's representative, "would be willing to contact ACMS to obtain those subcontractor invoices for all of the repair work it has performed at the property," and Lyman Ward's representative testified "Yes, sir." [Exhibit E (EUO Transcript of Mark Morgan), trp. 58:10–15].

41.     When asked "[I]s that an inquiry that Lyman Ward would be willing to make with ACMS to make – to see if they have any of those photographs" showing claimed storm damage for which Lyman Ward has not been paid for by Travelers, Lyman Ward's representative testified "Yes." [Exhibit E, trpp. 65:1–5].

42.     When asked whether Lyman Ward "would be willing to inquire of ACMS or Corbitt Public Adjusting to see if there is a contract" for appraisal of this loss, Lyman Ward's representative testified, "Yes, sir." [Exhibit E, trp. 64:3–11].

43.     As for the Supplemental Roof Damages and the Supplemental Interior Damages Lyman Ward claims, Mr. Morgan was not able to identify any items of damage that made up the difference between the amount in the Sworn Statement Proof of Loss $4,256,265.43 and the Travelers revised RCV amount of $2,512,143.58.

44.    Since the storm, Tallapoosa Hall has been used to its full capacity. [Exhibit E, trp. 26:21–23].

45.    Mr. Morgan testified that, to his knowledge, the remaining damage to Tallapoosa Hall were "cosmetic issues." [Exhibit E, trp. 28:3–5].

46.    Mr. Morgan testified that the only remaining storm damage to Tallapoosa Hall that he'd observed was "[S]ome water damage where water had come in. Just touching up areas like that. Primarily, it would be painting, in my estimation." [Exhibit E, trp. 27:11–20].

47.    When asked to provide an idea of where Mr. Morgan saw the water staining in Tallapoosa Hall, he testified "Primarily the second floor," then clarified "Second floor west side." [Exhibit E, trp. 28:12–19].

48.    Additionally, Mr. Morgan testified that the AC units in Tallapoosa Hall were "not pumping correctly," and have air exchanges in the building's attic "that tend to fill up with water more frequently than they did before." He confirmed the units were functional. [Exhibit E, trpp. 29:14–32:2].

49.    The water staining and AC unit draining were the only presently-existing issues in Tallapoosa Hall that Lyman Ward's representative identified.

50.    Since the storm, Russell Hall has been utilized to its full extent. [Exhibit E, trpp. 20:21–21:2]. In addition to replacing the roof, repairs to windows in Russell Hall have also been made. [Exhibit E, trp. 21:3–8]. During his examination under oath Mr. Morgan was asked, "Is there any damage you know of to the Russell Hall building that is awaiting repair?" He testified, "I'm thinking there might be some painting that needs to be done." [Exhibit E, trp. 21:9–12].

51.    Dixon Chapel is being used to its full capacity. [Exhibit E, trp. 24:13–15]. The only repairs Mr. Morgan is aware that were made to Dixon Chapel following the storm is the roof

replacement. [Exhibit E, trp. 22:12–15]. The only damage to Dixon Chapel is the lack of repair or patching of a hole that was cut into the ceiling of the chapel's entry vestibule. [Exhibit E, trpp. 22:16–23:4].

52.     The President's House is being used to its full capacity. [Exhibit E, trp. 24:11–12]. The President's House has received "new siding, new windows" following the storm. [Exhibit E, trp. 23:16–18]. Mr. Morgan testified that "there may be some water damage from the broken windows" inside the President's House, but he had "only been in [the President's House], like, once or twice." [Exhibit E, trpp. 23:19–24:6].

53.     The Commandant's House is presently being used. [Exhibit E, trp. 17:17–18]. The roof on the building has been replaced. [Exhibit E, trpp. 16:20–17:1]. Mr. Morgan testified that the Commandant's House only unrepaired storm damage he knew of was "broken windows." [Exhibit E, trp. 17:7–13].

54.     The Dining Hall is being used to its full capacity. [Exhibit E, trp. 19:13–16]. In addition to repairing the roof, Mr. Morgan testified that after the storm the Dining Hall had "a couple of windows out" and "had some work done on the freezer that was related to the storm, from what I was told." [Exhibit E, trpp. 19:6–20:2]. Other than one window that may be repaired, Mr. Morgan could not think of any unrepaired damage to the Dining Hall. [Exhibit E, trpp. 19:6–20:8].

55.     The Barn is being used. [Morgan EUO, trp. 18:7–9]. The barn's roof was repaired. [Exhibit E, trp. 17:22]. Mr. Morgan "didn't know of anything else that needed to be done with the barn." [Exhibit E, trpp. 17:22–18:1].

56.    As recently as April 14, 2025, Travelers again wrote to Lyman Ward reiterating its many repeated requests for the same roofing subcontractor invoices that were originally requested on December 20, 2023.

57.    Lyman Ward has not produced the roofing repair invoice documents generated by any subcontractor(s) who repairs the roof on the Insured Buildings.

58.    In addition to the roofing subcontractor invoices, Lyman Ward has also not produced moisture mapping or drying log materials, photographs of any alleged damage other than those taken by Travelers' or Lyman Ward's consultants as part of the Storm damage claim, or Lyman Ward's contract with its appraiser.

<u>**APPLICABLE POLICY PROVISIONS**</u>

59.    The Policy states, in part, as follows:

**A.    COVERAGE**

We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

60.    The Policy contains the following Covered Causes of Loss

**B.    COVERED CAUSES OF LOSS**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

**1.**    Excluded in Section **C.**, Exclusions;

**2.**    Limited in Section **D.**, Limitations; or

**3.**    Excluded or limited in the Declarations or by endorsement.

61.    The Policy contains the following Additional Condition:

**H.    ADDITIONAL CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions – Deluxe:

. . .

**9.      Policy Period, Coverage Territory**

Under this Coverage Part:

      **a.**      We cover loss or damage commencing:

            **(1)**      During the policy period shown in the Declarations; and

            **(2)**      Within the Coverage Territory.

62.      The Policy contains the following Exclusion:

**C.      EXCLUSIONS**

. . .

      **2.**      We will not pay for loss or damage caused by or resulting from any of the following:

. . .

      **i.**      **Other Types of Losses**

            **(1)**      Wear and tear;

            . . .

            **(4)** Settling, cracking, shrinking, bulging or expansion;

63.      The remaining Supplemental Interior Damages are not damages caused by the Storm. Rather, they are damages that had already commenced before the beginning of the policy period and/or to which the above exclusion applies.

64.      Since the Storm, Lyman Ward has replaced the roof on each of the Insured Buildings.

65.     Travelers has paid Lyman Ward the RCV amounts in the Travelers estimate for the repairs to the roofs of the Insured Buildings, including depreciation that was initially held back until the roofs were replaced.

66.     During the course of Travelers' investigation into Lyman Ward's claim, Travelers requested Lyman Ward provide documents related to the Insured Buildings and claimed damage to them.

67.     The Policy includes the following Condition:

**G.     LOSS CONDITIONS**

. . .

        **3.     Duties in the Event of Loss or Damage**

            **a.**    You must see that the following are done in the event of loss of or damage to Covered Property:

                **. . .**

                **(6)**    As often as may be reasonably required, permit us to inspect the property and records proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis and permit us to make copies from your books and records.

                . . .

                **(8)**    Cooperate with us in the investigation or settlement of the claim.

                **(9)**    You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent except as respect to protecting property from further damage.

            **b.**    We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this

insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**4.    Loss Payment**

**a.** In the event of loss or damage covered under this Coverage Form, at our option, we will either:

**(1)** Pay the value of lost or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property subject to **b., c., d.** and **e.** below

. . .

**6.    Valuation**
We will determine the value of Covered Property in the event of loss or damage as follows:

**a.** At replacement cost as of the time of loss or damage, except as otherwise provided in this Valuation Loss Condition. Replacement cost is the cost to replace Covered Property at the time of loss or damage without deduction for depreciation.

**(1)** You may make a claim for loss or damage covered by this insurance on the actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

**(2)** We will not pay on a replacement cost basis for any loss or damage:

**(a)** Until the lost or damaged property is actually repaired or replaced; and

**(b)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

Instead, we will pay on an actual cash value basis. This restriction does not apply to losses less than $10,000.

**(3)** We will not pay more for loss or damage on a replacement cost basis than the least of **(a), (b),** or **(c),** subject to **(4)** below:

**(a)** The Limit of Insurance applicable to the lost or damaged property;

**(b)** The cost to replace, at the same premises, the lost or damaged property with other property;

**(i)** Of comparable material and quality;
. . .

**(c)** The amount you actually spend that is necessary to repair or replace the lost or damaged property.

68.     Since the Storm, Lyman Ward has replaced the roof on each of the Insured Buildings.

69.     Since December 20, 2023, Travelers has made repeated requests to Lyman Ward to produce the subcontractor invoices for the roof replacement.

70.     Lyman Ward has not produced a single subcontractor invoice for the replacement of any of the seven roofs.

71.     Travelers has paid Lyman Ward $1,846,090.01[3] for storm damage to the seven Insured Buildings.

---

[3]Lyman Ward's coverage under the Policy is subject to a $50,000 deductible, so the amount of damage indemnified when the deductible is considered equals $1,896,090.01.

72.    That payment includes the actual cost value of all Storm damage to the Insured Buildings and the replacement cost value, including depreciation, for all repair work that has been completed and for which Lyman Ward has provided documentation.

73.    The Policy contains the following appraisal provision:

**G.    LOSS CONDITIONS**

. . .

**2.    Appraisal**

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having specific jurisdiction. The appraisers will state separately the value of the property and the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.**    Pay its chosen appraiser; and

**b.**    Bear the expenses of the appraisal and umpire equally.

If there is an appraisal, we still retain our right to deny the claim.

74.    Appraisal of the Supplemental Roof Damages is not appropriate because the roofs have been repaired. In that circumstance, the Policy's Loss Payment and Valuation conditions dictate the amount owed for the repairs—either the Travelers' estimate amount or the actual cost of necessary repairs, based on pricing at the time of loss, whichever is less. To that end, Travelers has requested the actual subcontractor invoices for the roof repairs so that it can determine the actual cost of the necessary repairs.  Lyman Ward has failed to produce the subcontractor invoices

for the roof repairs, which are essential for Travelers' investigation of the Supplemental Roof Damages and the actual costs of the necessary repairs.

75.    The claim for Supplemental Interior Damages is also not appropriate for appraisal as Lyman Ward maintains the damages were caused by the Storm. Travelers has determined that the damages are not as a result of the Storm but rather are as a result of causes excluded from coverage under the Policy. As such, they are coverage issues and not appropriate for appraisal under the appraisal provision.

76.    Moreover, Lyman Ward's failure to provide the requested documentation is in violation of the conditions of the Policy as required under Alabama law in order to invoke the appraisal provision of the Policy.

77.    Travelers has paid the ACV for the completed repair to Storm damage to the Insured Buildings and RCV for the repairs that Lyman Ward has completed due to Storm Damage on the Insured Buildings.

<u>COUNT I</u>
**DECLARATORY JUDGMENT THAT LYMAN WARD BREACHED THE POLICY'S CONDITIONS**

78.    Travelers hereby adopts and reasserts the allegations of Paragraphs 1 through 57.

79.    Lyman Ward breached the conditions of the Policy by withholding the subcontractor invoices for roof replacement on the Insured Buildings from Travelers.

80.    Lyman Ward breached the conditions of the Policy by withholding photographs and videos of the interior of the Insured Buildings from January 1, 2020 to the present.

81.    Lyman Ward breached the conditions of the Policy by failing to satisfy their duty to cooperate with Travelers in its investigation of the claim.

82.     Travelers has no further obligation under the Policy for any of the outstanding damages claims because Lyman Ward breached the conditions of the Policy.

83.     Accordingly, Travelers seeks a declaration that Lyman Ward has violated the conditions of the Policy and Travelers is relieved of any further obligations under the Policy for the loss at issue.

## <u>COUNT II</u>
## DECLARATORY JUDGMENT THAT APPRAISAL IS NOT APPROPRIATE

84.     Travelers hereby adopts and reasserts the allegations of Paragraphs 1 through 57.

85.     Lyman Ward's invoking of the Appraisal Condition of the Policy is not valid as Lyman Ward has failed to satisfy all the conditions of the Policy, which is a pre-condition to entering appraisal.

86.     Lyman Ward's claim for Supplemental Roof Damages claim is not subject to appraisal as the repairs were completed prior to the appraisal demand.

87.     Completing the repairs before demanding appraisal is both inconsistent with the intent to demand appraisal and caused prejudice to Travelers by preventing further evaluation of the extent of damage within the appraisal process.

88.     Lyman Ward has therefore waived the appraisal provision.

89.     Moreover, Lyman Ward's failure to provide the requested documentation in the form of sub-contractor invoices and a breakdown of ACMS's charges is a breach of the conditions of the Policy, the satisfaction of which is a pre-requisite to appraisal under Alabama law. Said breach precludes appraisal of the Supplemental Roof Damages.

90.     Moreover,  Travelers' obligations are defined by the terms and conditions of the Policy. Specifically, Lyman Ward's claim for roof repairs cannot exceed the actual, necessary

invoiced amount and Lyman Ward has not provided the requested documentation. Travelers' obligations under the Loss Valuation Condition is a question of coverage and not subject to appraisal.

91.    Lyman Ward's claim for Supplemental Interior Damages is not appropriate for appraisal as the parties disagree as to the cause of the claimed damages. These claimed damages involve only coverage issues, which are issues of law for the Court to decide and are not appropriate for appraisal under Alabama law.

92.    Accordingly, Travelers seeks a declaration that it has no obligation under the Policy to engage in appraisal and its obligations for these damages claims are determined by the conditions of the Policy and not appraisal.

93.    Alternatively, Travelers seeks a declaration that its obligation under the Policy to engage in appraisal and its obligations for those damages claimed extend only to the exterior and interior damage that have not been repaired but are identically identified in both Travelers' and ACMS's estimates of the damage, which does not include the Supplemental Roof Damages or the Supplemental Interior Damages.

## <u>COUNT III</u>
### DECLARATORY JUDGMENT THAT ANY REMAINING CLAIMED DAMAGE TO THE INSURED PROPERTY IS NOT COVERED BY THE POLICY

94.    Travelers hereby adopts and reasserts the allegations of Paragraphs 1 through 57.

95.    Travelers has paid the full ACV to repair all damage to the Insured Buildings caused by the Storm and has paid the RCV on all damage to the Insured Buildings caused by the Storm for repairs that have been completed and supporting documentation submitted by Lyman Ward.

96.    Travelers has satisfied its obligations to Lyman Ward under the Policy regarding all damages to the Insured Buildings caused by the storm.

97.    The only further coverage available to Lyman Ward under the Policy is withheld depreciation for Storm damage repairs that Lyman Ward has not yet completed.

98.    In addition to the Storm damage, Lyman Ward's claim for coverage includes additional defects that were caused by wear and tear deterioration and/or were caused by settling, cracking, shrinking, bulging or expansion.

99.    Lyman Ward's claim for coverage includes damage that commenced before the beginning of the Policy's policy period.

100.    Lyman Ward's claim for coverage includes damage that was not caused by the Storm and is excluded from the Policy.

101.    Lyman Ward's claim for coverage includes damage that does not constitute physical loss.

102.    Accordingly, the Policy does not provide coverage for any of the remaining damages that Lyman Ward claims.

103.    Travelers seeks a declaration that it has satisfied its obligations under the Policy and the remaining damages Lyman Ward claims are excluded under the Travelers policy.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Travelers Property Casualty Company of America, requests the following relief:

(A)    That this Honorable Court take jurisdiction of this Complaint;

(B)    That this Honorable Court order, adjudge, and decree that this is a proper case for declaratory judgment relief and that there is a bona fide controversy between the parties as to their legal rights, status, and liabilities;

(C)    That the process of this Honorable Court be issued to Defendant as provided by law and the rules of this Court and that Defendant be ordered to respond

to this Complaint within the time prescribed by law, or in the event of a failure to do so, suffer a decree *pro confesso*;

(D)     That this Honorable Court order, adjudge, and decree that Defendant breached the conditions of the Policy;

(E)     That this Honorable Court order, adjudge, and decree that the Policy is void as a result of the breach of the conditions of the Policy by Defendant.

(F)     That this Honorable Court order, adjudge, and decree that no coverage is afforded under the Policy for the damages resulting from the March 26, 2023 storm loss.

(G)     That this Honorable Court order, adjudge, and decree that no further coverage is afforded under the Policy for alleged damages to the Subject Property;

(H)     That this Honorable Court order, adjudge, and decree that appraisal is not appropriate regarding the alleged damages to the Subject Property;

(I)     That this Honorable Court enjoin Defendant from invoking the appraisal provision of the Policy regarding the alleged damages to the Subject Property;

(J)     That this Honorable Court order, adjudge, and decree that Travelers has already satisfied any obligations it has to Defendant under the Policy;

(K)     That, if Travelers is mistaken in any special relief herein prayed for, then it prays for such other, further, more general relief to which it may be entitled in the premises.

Dated: May 30, 2025

Respectfully submitted,

 s/Brenen G. Ely
Brenen G. Ely (asb-0366-e54b)
Lauren A. Wiggins (asb-2400-l13o)
*Counsel for Travelers Property Casualty Company of America*

**OF COUNSEL:**
ELY, McCURRY, & HUNTER, LLC
3500 Blue Lake Drive
Suite 345
Birmingham, Alabama 35243

Telephone: (205) 313-1200
Facsimile: (205) 313-1201
bely@elyfirm.com
lwiggins@elyfirm.com